**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| RENEE HEATHER POLLY, MELISSA LOTZMAN, JAIRO JARA, ELIJAH MORGAN, STEVEN NICKENS, DAVID VIGLIELMO, JENNIFER WALLACE, SUZANE APODACA, ANNETTE PEARSON, THOMAS PEARSON, DeLEON McKEE, DAKAR VILLA, DARIUS BRYANT, ROBYN PETERSEN, CHRISTOPHER CONDIE, HEATHER ANDERSON, ETHEL HOLLOWAY, ELIHU GUISTE, STEVEN DIAZ, LYNDA CRILLEY, and JULIO VARGAS Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:16-cv-9754<br><br>Judge: Hon. Manish S. Shah<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| ADTALEM GLOBAL EDUCATION INC. f/k/a DeVRY EDUCATION GROUP, INC., DeVRY UNIVERSITY, INC., and DeVRY/NEW YORK INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

**<u>FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

Plaintiffs Renee Heather Polly, Melissa Lotzman, Jairo Jara, Elijah Morgan, Steven

Nickens, David Viglielmo, Jennifer Wallace, Suzane Apodaca, Annette Pearson, Thomas

Pearson, DeLeon McKee, Dakar Villa, Darius Bryant, Robyn Petersen, Christopher Condie,

Heather Anderson, Ethel Holloway, Elihu Guiste, Steven Diaz, Lynda Crilley, and Julio

Vargas ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated

against Defendants Adtalem Global Education Inc., f/k/a as DeVry Education Group, Inc.

("Adtalem"), DeVry University, Inc. ("DeVry" or "DVU"), and DeVry/New York Inc.

("DeVry New York") (collectively "DeVry" or "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action against Defendants for falsely and misleadingly advertising the employment rates of DeVry graduates in their field. Defendants knew these representations to be false, but continued to make them over a long period and in a wide variety of media as part of a long-running deceptive scheme designed to increase demand for DeVry's educational services, to inflate the tuition rate defendants could charge and to increase DeVry's sales of educational services by falsely inducing potential students to enroll at DeVry and pay tuition to Defendants.

2.      DVU is a private, for-profit, post-secondary educational institution operated by Defendants. It has more than fifty (50) campuses throughout the United States, spread across eighteen (18) states, as well as an online presence that reaches every state in the nation. DVU's predecessor, DeVry Institute of Technology, began offering bachelor's degrees in 1970, and DVU now comprises five colleges and a graduate school of business.

3.      Since 1975, more than 870,000 students have enrolled at DVU or its predecessor, and approximately 278,000 undergraduate students have obtained degrees from DVU or its predecessor. Defendants have repeatedly and conspicuously maintained, for well over a decade, and until no earlier than January 2016, in their advertising that 90% of DeVry graduates who were actively seeking employment obtained new jobs in their field of study within six months of graduation.

4.      On information and belief, Defendants knew at all relevant times that the 90%
representation was a key performance metric that a reasonable consumer would consider in
deciding on whether or not to purchase educational services from DeVry.

5.      While Defendants' use of the 90% representation as a long-running marketing
campaign appears to have been very effective for DeVry in recruiting and enrolling new
students, it also turns out that the 90% representation is false.  Among other steps described
below, the DVU agreed in a settlement with the U.S. Department of Education to publicly post
an admission that it could not substantiate the "since 1975" version of the 90% representation.

6.      Defendants intended that prospective students rely on these false claims when
deciding whether or not to enroll at DeVry. Plaintiffs relied on the 90% representation and
enrolled in undergraduate degree programs at DeVry after seeing and/or hearing DeVry's false
representations regarding the employment outcomes of DeVry's graduates.

7.      Plaintiffs and each member of the Class decided to enroll at DeVry and pay
tuition in the amounts set by DeVry after hearing DeVry's representations regarding the
employment outcomes of DeVry graduates.

8.      However, Plaintiffs and members of the Class did not receive the benefit of their
bargain with DeVry and have suffered an ascertainable out-of-pocket loss because had they
known DeVry's 90% representation was false, Plaintiffs either would not have purchased
educational services from DeVry or would have paid less for them.

9.      Plaintiffs seek relief in this action individually and on a class-wide basis for
violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.* other state consumer
protection acts, and common law.

## THE PARTIES

**Plaintiffs**

10.     Plaintiff Heather Renee Polly ("Polly") is a resident of Morberly, MO and a citizen of Missouri.  Plaintiff Polly took online and in-person courses (Kansas City Campus) while residing in Missouri and graduated with a Bachelor of Science degree in Business Administration in 2004.  Plaintiff Polly saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

11.     More specifically, prior to enrolling at DeVry in March of 2000, in or around July 1999 through January 2000, Plaintiff Polly recalls seeing promotional materials for DeVry on television, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry.  In or around September 1999, Plaintiff Polly also recalls that a DeVry recruiter (Gary) made this same representation to her.  Plaintiff Polly relied upon DeVry's false "90%" representation in making her decision to attend DeVry.  Had Plaintiff Polly known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

12.     Plaintiff Melissa Lotzman ("Lotzman") is a resident of Colorado Springs and a citizen of Colorado.  Plaintiff Lotzman took online and in-person (Colorado Springs Campus) courses from July 2001 through June 2004 while residing in Colorado and graduated with a Associate's Degree in Computer Information Systems on June 20, 2004.  Plaintiff Lotzman saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

13.      More specifically, prior to enrolling at DeVry in July of 2001, in or around May 2001, Plaintiff Lotzman recalls seeing promotional materials for DeVry on billboards, and TV

4

commercials, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry. Plaintiff Lotzman also recalls that a DeVry employee made this same representation to her several months prior to her enrollment. Plaintiff Lotzman relied upon DeVry's false "90%" representation in making her decision to attend DeVry. Had Plaintiff Lotzman known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

14. Plaintiff Jairo Jara ("Jara") is a resident of Hollywood, Florida and a citizen of Florida. Plaintiff Jara took in-person courses at DeVry while residing in New Jersey (North Brunswick Campus) and graduated with a Bachelor of Science degree in Network and Communications Management in 2006. Plaintiff Jara saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

15. More specifically, between December 2000 and until enrolling at DeVry in October of 2001, Plaintiff Jara recalls seeing in Florida promotional materials for DeVry in the form of television, print mail, and email advertisements which all made the specific representation that "95%" of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry. Plaintiff Jara relied upon DeVry's aforesaid false representations in making his decision to attend DeVry. Had Plaintiff Jara known that the "95%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

16. Plaintiff Elijah Morgan ("Morgan") is a resident of Tallahassee, FL and a citizen of Florida. Plaintiff Morgan took online courses from March 2008 through October 2010 while residing in Florida and graduated with a Bachelor of Arts degree in Technical Management in

October 2010.  Plaintiff Morgan saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

17.     More specifically, prior to enrolling at DeVry in March of 2008, in or around February 2008, Plaintiff Morgan recalls seeing promotional materials for DeVry on DeVry's website, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry.

18.     In or around February 2008, Plaintiff Morgan remembers filling out DeVry's "contact form" on DeVry's website, and a recruiter reached out to him via email and phone. Plaintiff Morgan also recalls that in or around February 2008 a DeVry recruiter made this same "90%" representation to him too.  Plaintiff Morgan relied upon DeVry's false representations in making his decision to attend DeVry.  Had Plaintiff Morgan known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

19.     Plaintiff Steven Nickens ("Nickens") is a resident of Baltimore, MD and a citizen of Maryland.  In March 2001, Plaintiff Nickens took in-person courses at the DeVry Fremont California campus and in 2003 while residing in Maryland, Plaintiff Nickens also took in-person and on-line courses at the Arlington Virginia campus and graduated with an Bachelor of Science Degree (Network Communication Management) in October 2009.  Plaintiff Nickens saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

20.     More specifically, prior to enrolling at DeVry in February 2001, in or around January 1999 through February 2001, Plaintiff Nickens recalls seeing promotional materials for DeVry on DeVry's website and television commercials, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of

study within six months of graduation from DeVry. Plaintiff Nickens also recalls in February 1999 a female representative from DeVry came to his home and gave Plaintiff Nickens and his parents a presentation about DeVry's history and what DeVry could offer. The DeVry representative showed stats of what a college path would look like versus what a DeVry path would look like based on graduating in three (3) years, getting hands on experience, and the 90% representation of job placement within his chosen field of within six (6) months of graduation. Plaintiff Nickens relied upon DeVry's false "90%" representation in making his decision to attend DeVry. Had Plaintiff Nickens known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

21.     Plaintiff David Viglielmo ("Viglielmo") is a resident of Tinley Park, Illinois and a citizen of Illinois. Plaintiff Viglielmo took in-person and online courses (Tinley Park Campus) while residing in Illinois and graduated with a Bachelor of Science degree in Technical Management in 2012. Plaintiff Viglielmo saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

22.     More specifically, beginning around two to three months prior to and continuing until enrolling at DeVry in September of 2008, Plaintiff Viglielmo recalls seeing promotional materials for DeVry in the form of online, print and television advertisements which all made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry. Plaintiff Viglielmo also recalls that a DeVry recruiter made this same representation to him. Plaintiff Viglielmo relied upon DeVry's aforesaid false representations in making his decision to attend DeVry. Had Plaintiff Viglielmo known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

23.     Plaintiff Jennifer Wallace ("Wallace") is a resident of Circleville, Ohio and a citizen of Ohio.  In March 1998, Plaintiff Wallace took in-person courses at the DeVry Alum Creek Drive campus in Columbus, Ohio and graduated with an Bachelor of Science degree (Business Information Systems) in June 2001.  Plaintiff Wallace saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

24.     More specifically, prior to enrolling at DeVry in March 1998, in or around January 1998 through February 1998, Plaintiff Wallace recalls seeing promotional materials for DeVry on television commercials, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry.  Plaintiff Wallace also recalls in January 1998 a female DeVry recruiter made this same representation to her.  Plaintiff Wallace relied upon DeVry's false "90%" representation in making her decision to attend DeVry.  Had Plaintiff Wallace known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

25.     Plaintiff Suzane Apodaca ("Apodaca") is a resident of Bonney Lake, WA and a citizen of Washington.  Plaintiff Apodaca took online and in-person (Federal Way DeVry campus) courses while residing in Washington and graduated with a Bachelor of Arts degree in Business Administration in February 2012.  Plaintiff Apodaca saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

26.     More specifically, prior to enrolling at DeVry in or around January 2009, from January 2008 through December 2008 (prior to Plaintiff Apocada's enrollment), Plaintiff Apocada recalls seeing promotional materials for DeVry on television and DeVry's website, which made the specific representation that 90% of DeVry's graduates actively seeking

employment had careers within their field of study within six months of graduation from DeVry. Plaintiff Apocada also recalls that DeVry recruiters (Jill Petrone and Sandhya Gangaram) made this same representation to her. Plaintiff Apocada relied upon DeVry's false "90%" representation in making her decision to attend DeVry. Had Plaintiff Apocada known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

27.    Plaintiff Annette Pearson ("A. Pearson") is a resident of Simi Valley, CA and a citizen of California. Plaintiff A. Pearson took in-person (at DeVry Addison IL campus) courses from February 2002 through May 2003 while residing in Illinois and on-line from February 2004 through August 2007 in North Carolina and graduated with a Bachelor of Arts degree in Project Management in 2007. Plaintiff A. Pearson saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

28.    More specifically, prior to enrolling at DeVry in December 2001, in or around September 2001, Plaintiff A. Pearson recalls seeing promotional materials (in Illinois) for DeVry on television and in DeVry pamphlets/brochures, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry. Plaintiff A. Pearson also recalls that in or around September 2001 a DeVry recruiter made this same representation to her. Plaintiff A. Pearson relied upon DeVry's aforesaid false representations in making her decision to attend DeVry. Had Plaintiff Pearson known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services. A. Pearson also recalls receiving emails containing the "90%" representation from DeVry after she enrolled. *See* Exhibit A.

29.     Plaintiff Thomas Pearson ("T. Pearson") is a resident of Simi Valley, CA and a citizen of California.  Plaintiff T. Pearson took online and in-person (at DeVry Raleigh NC campus) courses while residing in North Carolina and graduated with a Bachelor of Arts degree in Technical Management in 2011.  Plaintiff T. Pearson saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

30.      More specifically, prior to enrolling at DeVry in October 2008, in or around August 2008, Plaintiff T. Pearson recalls seeing promotional materials in North Carolina for DeVry on television, in DeVry pamphlets/brochures and DeVry's website, which made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation from DeVry.  Plaintiff T. Pearson also recalls that in or around August 2008 a DeVry recruiter made this same representation to him. Plaintiff T. Pearson relied upon DeVry's false "90%" representation in making his decision to attend DeVry.  Had Plaintiff Pearson known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

31.     Plaintiff T. Pearson also remembers seeing in or around August 2008 the "90.2% representation" attached hereto at  Exhibit J  on DeVry's website.

32.     Plaintiff Dakar Villa ("Villa") is a resident of Goodyear, AZ and a citizen of Arizona.  Plaintiff Villa took in-person courses while residing in Illinois (Chicago campus) and graduated with a Bachelor of Science in Business Operations degree in 1992.  Plaintiff Villa saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

33.     More specifically, beginning six months prior to enrolling at DeVry in 1989, Plaintiff Villa recalls seeing promotional materials for DeVry in the form of print and television advertisements which all made the specific representation that "96%" of DeVry's graduates

actively seeking employment had careers within their field of study within six months of graduation from DeVry. Plaintiff Villa also recalls that a DeVry recruiter made this same representation to him. Plaintiff Villa relied upon DeVry's aforesaid false representations in making his decision to attend DeVry. Had Plaintiff Villa known that the "96%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

34.     Plaintiff Darius Bryant (Bryant") is a resident of Durham, NC and citizen of North Carolina. Plaintiff Bryant took on-line courses while residing in North Carolina and graduated with a Bachelor of Science in Business Information Systems and Technical Management degree in 2014. Plaintiff Bryant saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

35.     More specifically, beginning in or around October 2009 through enrolling at DeVry in August 2010, Plaintiff Bryant recalls seeing promotional materials for DeVry in the form of online and television advertisements which made the representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Bryant also recalls that a DeVry recruiter made the same or a substantially similar representation to him. Plaintiff Bryant relied upon DeVry's aforesaid false representations in making his decision to attend DeVry. Had Plaintiff Bryant known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

36.     Plaintiff Robyn Petersen ("Petersen") is a resident of Paia, Hawaii and a citizen of Hawaii. Plaintiff Petersen took on-line courses while residing in California and graduated with a Bachelor of Science in Human Resources Management in 2008. Plaintiff Petersen saw and

relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

37.     More specifically, beginning around October 2003 through enrolling at DeVry in October 2004, Plaintiff Petersen recalls seeing promotional materials for DeVry in the form of television advertisements which made the representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Petersen relied upon DeVry's aforesaid false representation in making his decision to attend DeVry. Had Plaintiff Petersen known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

38.     Plaintiff Christopher Condie ("Condie") is a resident of Prairie Village, KS and a citizen of Kansas. Plaintiff Condie took on-line courses and in-person courses (Kansas City campus) while residing in Missouri and graduated with a Bachelor of Science in Technical Management degree in 2013. Plaintiff Condie saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

39.     More specifically, prior to enrolling at DeVry in September of 2008, Plaintiff Condie recalls seeing promotional materials for DeVry in the form of print and television advertisements which made the representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Condie also recalls that a DeVry recruiter named Kerry Marcus made a same or substantially similar representation to him. Plaintiff Condie relied upon DeVry's aforesaid false representation in making his decision to attend DeVry. Had Plaintiff Condie known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

40.     Plaintiff Heather Anderson ("Anderson") is a resident of South Jordan, UT and a

citizen of Utah. Plaintiff Anderson took on-line courses and in-person courses while residing in Utah and received a Bachelor of Science in Business Administration from DeVry in Sandy, Utah in 2010. Plaintiff Anderson saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

41.     More specifically, beginning January 2006 and through enrolling at DeVry in May of 2006, Plaintiff Anderson recalls seeing promotional materials for DeVry in the form of online, radio, and on-campus advertisements which all made the specific representation that "85%" of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Anderson relied upon DeVry's aforesaid false representation in making her decision to attend DeVry. Had Plaintiff Anderson known that the "85%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

42.     Plaintiff Ethel Holloway ("Holloway") is a resident of Locust Grove, GA and a citizen of Georgia. Plaintiff Holloway took on-line courses and in-person courses while residing in Georgia and graduated with a Bachelor of Science in Business Administration degree in 2014. Plaintiff Holloway saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

43.     More specifically, beginning February 2010 through enrolling at DeVry in July of 2010, Plaintiff Holloway recalls seeing promotional materials for DeVry in the form of television advertisements which made the representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Holloway also recalls that a DeVry recruiter made the same or a substantially similar representation to her. Plaintiff Holloway relied upon DeVry's aforesaid false representations in

making her decision to attend DeVry. Had Plaintiff Holloway known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

44.     Plaintiff Elihu Guiste ("Guiste") is a resident of Houston, TX and a citizen of Texas. Plaintiff Guiste took in-person (Orlando campus) courses and on-line courses while residing in Florida and graduated with a Bachelor of Science degree in Electronic Engineering Technology in 2009. Plaintiff Guiste saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

45.     More specifically, beginning around one year prior to enrolling at DeVry in 2004 and continuing through enrollment, Plaintiff Guiste recalls seeing promotional materials for DeVry in the form of television advertisements which all made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Guiste also recalls that a DeVry recruiter made the representation to him that 90% of DeVry's graduates actively seeking employment had careers in their field within 60 days. Plaintiff Guiste relied upon DeVry's aforesaid false representation in making his decision to attend DeVry. Had Plaintiff Guiste known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

46.     Plaintiff Steven Diaz ("Diaz") is a resident of Whittier, CA and a citizen of California. Plaintiff Diaz took on-line courses and in-person courses (Pomona campus) while residing in California and graduated with an Associate of Science degree in Network Systems Administration in 2012. Plaintiff Diaz saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

47.     More specifically, prior to enrolling at DeVry in July 2009, Plaintiff Diaz recalls seeing promotional materials for DeVry in the form of online, print and television advertisements which all made the specific representation that "90.3%" of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Diaz relied upon DeVry's aforesaid false representations in making his decision to attend DeVry. Had Plaintiff Diaz known that the "90.3%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

48.     Plaintiff Lynda Crilley ("Crilley") is a resident of Kansas City, MO and a citizen of Missouri. Plaintiff Crilley took in-person and online courses while residing in Missouri and graduated with a Bachelor of Business Administration in 2012. Plaintiff Crilley saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

49.     More specifically, beginning several months prior to enrolling at DeVry in 2007 through enrolling at DeVry, Plaintiff Crilley recalls seeing promotional materials for DeVry in the form of online and television advertisements which all made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation. Plaintiff Crilley also recalls that a DeVry recruiter made this same representation to her. Plaintiff Crilley relied upon DeVry's aforesaid false representation in making her decision to attend DeVry. Had Plaintiff Crilley known that the "90%" representation was false, she would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

50.     Plaintiff Julio Vargas ("Vargas") is a resident of Brooklyn, NY and a citizen of New York. Plaintiff Vargas took in-person (Midtown campus) and online courses while residing in New York and graduated with a Bachelor of Science in Business Administration in 2016.

Plaintiff Vargas saw and relied upon Defendants' "90%" representation in choosing to enroll at DeVry.

51.     More specifically, beginning around March 2013 and through enrolling at DeVry in 2014, Plaintiff Vargas recalls seeing promotional materials for DeVry in the form of online, print, and television advertisements, which all made the specific representation that 90% of DeVry's graduates actively seeking employment had careers within their field of study within six months of graduation.  Plaintiff Vargas also recalls that a DeVry recruiter made this same representation to him.  Plaintiff Vargas relied upon DeVry's aforesaid false representations in making his decision to attend DeVry.  Had Plaintiff Vargas known that the "90%" representation was false, he would not have enrolled at DeVry or would have paid less tuition for DeVry's educational services.

**Defendants**

52.     Defendant Adtalem Global Education Inc. ("Adtalem") is a Delaware corporation with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois.  Until May 24, 2017, it was known as DeVry Education Group Inc.  Prior to November 27, 2013, it was known as DeVry, Inc.

53.     Defendant DeVry University, Inc. ("DeVry" or "DVU") is a Delaware corporation with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois.  DeVry is a subsidiary of Adtalem.

54.     Defendant DeVry/New York, Inc. ("DeVry NY") is a Delaware corporation that also conducts business as DeVry College of New York.  It is a subsidiary of Adtalem, with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois.

## JURISDICTION AND VENUE

55.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from any Defendant.

56.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, as Defendants do business throughout this District, and Defendants' principal places of business are all in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

57.     DVU is a private, for-profit, post-secondary educational institution operated by Defendants. It has more than fifty (50) campuses throughout the United States, spread across eighteen (18) states, as well as an online presence that reaches every state in the nation. DVU's predecessor, DeVry Institute of Technology, began offering bachelor's degrees in 1970, and DVU now comprises five colleges and a graduate school of business.

58.     DVU's undergraduate degree programs are generally consistent throughout all of DVU's locations and most of these programs are also available on-line making them accessible to DeVry students in most states.

59.     Since 1975, more than 870,000 students have enrolled at DVU or its predecessor, and approximately 278,000 undergraduate students have obtained degrees from DVU or its predecessor.

60.     New student enrollment at DeVry between 2008 and 2014 ranged between 29,000 and 49,000 students per year.

61.     Adtalem's total gross revenue between 2008 and mid-2015 exceeded $14.5 billion, and DVU's gross revenues between 2008 and mid-2015 exceeded $8.6 billion. In each fiscal year between 2011 and 2014, DVU spent more than $135 million advertising, marketing, or promoting its educational products and services.

62.     This advertising has taken the form of television commercials, web advertisements (including on DeVry's website), in-person sales pitches by agents of Defendants, radio spots, brochures, print advertisements, and other advertising or promotional materials. Among others, Defendants target high school students, current and former members of the military, and the unemployed.

**The "90%" Representation**

63.     One of Defendants' key messages ubiquitous throughout Defendants' marketing is that after graduating from DeVry students actively seeking employment are highly likely to obtain a career in the student's chosen field of study soon after graduation.

64.     For many years, one of the primary methods by which Defendants' conveyed this message was through advertising that represented that 90% of DeVry graduates who were actively seeking employment obtained new jobs in their field of study within six months of graduation.

65.     This "90%" representation has been claimed, at various points, by Defendants to apply for a specific year (often 2012) and at other points to all graduates since 1975.

66.     The 90% representation was not mere puffery; as described below, it was frequently stated with explanations, footnotes or definitions that contextualized it not as a general claim, but as a specific and verifiable figure, based on a specific period and specific criteria.

67.     Nor is this representation a mere unexamined carry-over from one set of

18

marketing materials to the next. Defendants have, at times, varied the figure slightly, using figures such as 87% or 92%, though the 90% representation remains the most common.

68.     The "90%" representation is a core component of Defendants' branding, and it appears pervasively throughout Defendants' advertising and marketing across various forms of media.

69.     Advertisements showing Defendants' "90%" representations have appeared in numerous television advertisements in both English and Spanish. These advertisements have run on national broadcast, satellite, and cable channels. Among the many examples:

(a)     A widely-shown television ad in 2013 claimed, through an announcer, that "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months." At the same time, a screen appeared showing the same message in text with "90%" in, by far, the largest font. Following that text, another screen showed, "Join the 90%. Learn how at devry.edu";

(b)     Ads with substantially similar announcements and text were shown throughout the 2010-2016 period, including in 2010, 2013, and 2014; and

(c)     A 2013 advertisement on devry.edu featured prominently a graphic that stated: "In 2012, 90% of DeVry University GRADS actively seeking employment HAD CAREERS in their field within six months of graduation." At the end of "CAREERS" was a footnote mark which, at the end of the webpage, said, "Figure based on 2012 graduates self-reporting data to DeVry University Career Services who were employed at graduation or actively seeking employment in their field after graduation. Does not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry

19

University Career Services."

70.     Defendants have also advertised on YouTube, and have uploaded their advertisements to a YouTube channel available at https://www.youtube.com/user/TheDeVryUniversity/videos.    Several of these also contain versions of the "90%" representation, including "90% of our grads actively seeking employment had careers in 6 months" and "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months.  Learn how at devry.edu."

71.     Defendants have further disseminated or caused to be disseminated numerous brochures promoting DeVry.  One, directed toward college students, was made available in virtual format on its website between 2010 and 2015, which prominently included the statement: "For over 30 years, 90% of all DeVry graduates in the active job market have been employed in their field of study within six months of graduation*."  The asterisk led to fine print at the bottom of the web page which stated: "Active job market includes those already employed prior to graduation."  Other brochures disseminated or caused to be disseminated by DeVry during this time made substantially similar representations.

72.     A 2006 DeVry brochure stated in relevant part: "For the 10-year period ending *October 2006, 90 percent of DeVry graduates* who actively pursued employment or who were already employed when they graduated *held positions in their chosen fields within six months of graduation*."  *See* Exhibit B attached hereto (emphasis added).

73.     Another DeVry's 2006 brochure stated in relevant part: "For the 10-year period ending *October 2005*, *more than 90 percent of DeVry graduates* who actively pursued employment, or who were already employed when they graduated, *held positions in their*

20

*chosen fields within six months of graduation.*" *See* Exhibit C attached hereto (emphasis added).

74. Similarly, Defendants have also disseminated or caused to be disseminated print advertisements that contain similar versions of the "90%" representation. For example, during the Class Period, Defendants put forth a print advertisement that stated, "In 2012, 90% of DeVry University GRADS actively seeking employment HAD CAREERS in their field within six months of graduation*", followed by the phrase, "Join the 90%". The asterisk led to fine print which stated "Figure based on 2012 graduated self-reporting data to DeVry University Career Services who were employed at graduation or actively seeking employment in their field after graduation. Does not include master's degree graduates or graduates who were not actively seeking employment, as determined by DeVry, or who did not report data on employment status to DeVry."

75. Further, on Twitter, Defendants have repeatedly used the "90%" representation. For example, on July 29, 2013, Defendants, tweeted, "'90% of #DeVry grads active in the job market find employment in their field of study within 6 months.' @DeVryUniv president Dave Pauldine."

76. Additionally, in meetings with DeVry representatives, including initial calls and interactions with self-described "Admissions Advisors," Defendants have made the "90%" representation on numerous occasions. A standard part of the initial call script from 2013 until at least early 2016 was to include the sentence, "The DeVry University difference includes outstanding career outcomes – In 2012, 90% of DeVry University grads actively seeking employment had careers in their field within six months of graduation."

77. Admissions Advisors also routinely make or have made the "90%" representation

regarding DeVry graduates, as they are instructed to do in DeVry training manuals.

78. Likewise, DeVry's career services department would send emails to current or former students that contained the Representation. For example, in a June 5, 2008 email to Plaintiff Annette Pearson, states: "Did you know that since 1975, **90% of DeVry graduates system-wide in the active job market were employed in their fields within 6 months of graduation? It's true!**" *See* Exhibit A attached hereto (emphasis added).

79. DeVry also made the "90%" representation in various promotional materials on its website. Representational examples include the following:

(a) In 2005, DeVry's website stated the following: "For the 10-year period ending **June 2004**, **91 percent of DeVry's graduates** who actively pursued employment or who were employed when they graduated, **held positions in their chosen fields within 6 months of graduation**." *See* Exhibit D attached hereto (emphasis added).

(b) In 2005, DeVry's website stated the following: "For the 10-year period ending **October 2004**, **91 percent of DeVry graduates** who actively pursued employment or who were already employed when they graduated, **held positions in their chosen fields within six months of graduation.**" *See* Exhibit E attached hereto (emphasis added).

(c) In 2006, DeVry's website stated the following: "For the 10-year period ending **February 2006**, **90 percent of DeVry graduates** who actively pursued employment or who were already employed when they graduated, **held positions in their chosen fields within six months of graduation**." *See* Exhibit F attached hereto (emphasis added).

(d) In 2007, DeVry's website stated the following: "In fact, for the past year,

22

in all DeVry programs and locations combined (PDF), ***91% of DeVry graduates*** in the active job market nationwide ***were employed in their chosen field within 6 months of graduation*.**  *See* Exhibit G attached hereto.

(e)     In 2007, DeVry's website stated the following: "***More than 90% of DeVry graduates hold positions in their chosen field within 6 months of graduation.****  This means you'll earn more than a degree at DeVry.  You'll get career education that leads you straight into the professional world." *See* Exhibit H attached hereto (emphasis added).

(f)     In 2007, DeVry's website stated the following: "***90% of DeVry Grads* were employed in their field within 6 months of graduation*.**"  *See* Exhibit I attached hereto (emphasis added).

(g)     In 2008, DeVry's website stated the following: "***90.2% of DeVry grads were employed in their field within 6 months of graduation.****  "*Since 1975, 227,605 undergraduates students system-wide have graduated from DeVry and 90.2% of those in the active job market were employed in career-related positions within six months of graduation." *See* Exhibit J attached hereto (emphasis added).

(h)     In 2009, DeVry's website stated the following: "with a DeVry University degree in hand, you'll have the skills and confidence to work in today's fastest growing industries.  In fact, most Fortune 100 companies employ DeVry University graduates.  And overall, ***90% of DeVry grads system-wide in the active market are employed in their field within six months of graduations*.***"  *See* Exhibit K attached hereto (emphasis added).

(i)     In 2010, DeVry's website stated the following: "Since 1975, 237,957

23

undergraduate students system-wide have graduated from DeVry, and ***90% of those in the active job market were employed in career-related positions within six months of graduation***." *See* Exhibit L attached hereto (emphasis added).

(j) In 2011, DeVry's website stated the following: "Since 1975, 252,127 undergraduates students system-wide have graduated from DeVry University. Of graduates in the active job market, ***90.1% were employed in career-related positions within six months of graduation***." *See* Exhibit M attached hereto (emphasis added).

(k) In 2012, DeVry's website stated the following: "Since 1975, 258,361 undergraduates students system-wide have graduated from DeVry University. Of graduates in the active job market, ***90.1% were employed in career-related positions within six months of graduation***." *See* Exhibit N attached hereto (emphasis added).

**The Falsity of the "90%" Representation**

80. The facts needed to establish the falsity of Defendants' "90%" representation are in Defendants' possession and have not been made available to Plaintiffs.

81. On information and belief, Defendants' "90%" representation -- that was ubiquitous throughout Defendants' advertising and branding for decades -- is false.

82. On information and belief, Defendants have relied upon files maintained by the DeVry Career Services office to substantiate its "90%" representation. These files contain information about students' majors, graduation dates, employment, and DeVry classification of their employment status.

83. However, on information on belief, these files do not provide a reasonable basis for Defendants' "90%" representation. Among other reasons for this, Defendants count a substantial number of DeVry graduates who should be excluded from the "90%" figure. For

example, Defendants include a substantial portion of the graduates who, after graduation, continued with the same job they had at the time they enrolled at DeVry. Similarly, Defendants also routinely counted graduates who did not obtain jobs in their chosen fields of study as part of the "90%" representation. These jobs included jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study. Examples include DeVry graduates working as customer service representatives, as food service workers, and as unpaid volunteers.

84. On information and belief, Defendants also routinely excluded from the "90%" representation students who were actively seeking employment, including graduates who had self-classified as actively seeking employment and had been to job interviews in the preceding days or weeks before reclassification, as well as those who were applying or intending to apply for jobs while corresponding with the DeVry Career Services office.

85. Based on the forgoing, the actual percentage of DeVry graduates who, within six months of the time that time they graduated, could reasonably be considered to be employed "in their field" was and is markedly below 90%.

86. The basis for Plaintiffs' suspicions regarding the falsity of the "90%" representation arises from information obtained from or relating to various government investigations, legal actions and/or settlements of actions brought against Defendants relating to the "90%" representation and described in further detail below. These include lawsuits and/or investigations, conducted by the Federal Trade Commission ("FTC"), the U.S. Department of Education ("DoE"), the New York Attorney General and the Massachusetts Attorney General as well as a Securities Fraud Class Action.

**The FTC Action**

87.     On January 28, 2014, the Federal Trade Commission issued a Civil Investigative Demand ("CID") to DeVry seeking the production of documents and information concerning DeVry's advertising, marketing, or sales practices.

88.     On January 27, 2016, the FTC, with the benefit of DeVry's production of over 2 million pages of documents and information under the CID, filed suit against DeVry alleging that the various DeVry representations made in advertisements, including the "90%" representation, were false and misleading under Section 5 of FTC Act.[1]

89.     According to the FTC, Defendants had created their desired student employment outcome statistics by essentially choosing what information to include or omit in the statistics.   By doing this, the FTC stated, Defendants were able to push the narrative that, "as a result of obtaining a DVU degree, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation." The FTC explained that:

> [i]n some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years."   In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job. While Defendants' advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a percentage that is slightly less or more than 90% (e.g., 87% or 92%). ***As explained below, these representations (Defendants' "90% claims") are false and unsubstantiated.***  [(emphasis added).]

---

[1] *See Federal Trade Commission v. DeVry Education Group, Inc. et al.*, Case No. 2:16-cv-579 (C.D. Cal.) (Dkt. No. 1, filed January 27, 2016).

90.     The FTC further averred that, in substantiating the 90% claim, DeVry improperly relied upon student records maintained by DVU's Career Services department. While the student records contained information about students' majors, graduation dates, employment history, and DeVry's classification of their employment status, the FTC noted that:

> [t]hese student records, however, do not provide a reasonable basis that substantiates Defendants' 90% claims.  Among other reasons, when calculating the 90% claims, Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded.   For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU. In fact, Defendants include the substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU. Defendants also count graduates who did not obtain jobs in their field of study.  ***A significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study***.  [(emphasis added).]

91.     The FTC complaint also provided examples of DeVry graduates who were misclassified by DeVry as working in their field of study as including:

> (a)     graduates with degrees in technical management who were
> working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);
>
> (b)     a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory;
>
> (c)     a graduate with a degree in business administration (health care management specialization) working as a car salesman;
>
> (d)     a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison;

        (e)      graduates with various degrees working as customer service representatives.

92.     The FTC also alleged that Defendants excluded certain students from the calculation who were actively seeking employment. As noted by the FTC:

> For example, in June 2013, Defendants excluded one 2012 graduate who, prior to being classified as inactive: viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

93.     Due to the manner in which DeVry manipulated its student data, the FTC concluded that "[t]he actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could reasonably be considered 'in their field' is significantly smaller than 90%."

94.     On May 9, 2016, the Court presiding in the FTC action denied DeVry's motion to dismiss the FTC's complaint finding that the FTC stated a plausible claim for violation of Section 5 of the FTC Act and that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reasons for believing that the employment statistic is unsubstantiated and materially false."[2]

95.     On December 19, 2016, the Court in the FTC Action entered a detailed Stipulated

---

[2]     Order Denying Defs.' Mot. to Dismiss Compl. (ECF No. 38), *FTC v. DeVry Educ. Group, Inc., et al.,* Case No. 2:16-cv-00579 (C.D. Cal. May 9, 2016).

Order for Permanent Injunction and Monetary Damage.[3]

96.     The Stipulated Order, as relevant here, *inter alia*, permanently restrains and enjoins DeVry from misrepresenting the success that its students or graduates have realized or are likely to realize in starting or obtaining careers, jobs or employment including the extent to which whether represented as a percentage, or otherwise, graduates have obtained jobs or careers in their field of study within any given timeframe.

97.     Pursuant to the Stipulated Order, DeVry is also required to "preserve all Competent and Reliable Evidence relied upon to substantiate any representation concerning, among other things, employment outcomes for DeVry University graduates."

98.     DeVry is also required for 20 years to establish a training program for all "those who direct or engage in the promotion or sale of any educational product or service" for DeVry. This training program is to remain in place for 20 years and DeVry must "[e]nsure that the training program addresses the trainee's duty not to use or make any representation prohibited under this Order."

99.     The Stipulated Order also enters Judgment in the amount of One Hundred Million Dollars ($100,000,000.00) against DeVry consisting of $49,400,000.00 payable to the FTC with the balance to be applied by DeVry to forgive various loans and debts owned by DeVry undergraduates to DeVry.  According to an FTC press release, the $49.4 million dollars DeVry paid the FTC was to be distributed to qualifying students who were harmed by deceptive ads and the rest was to go towards debt relief.

100.     The FTC was not the only government actor to initiate legal proceedings against

---

[3]     Stipulated Order For Permanent Injunction And Monetary Judgment (ECF No. 98), *FTC v. DeVry Educ. Group, Inc., et al.,* Case No. 2:16-cv-00579 (C.D. Cal. December 19, 2016).

DeVry. The Department of Education, the Massachusetts Attorney General and the New York Attorney General all brought similar actions against DeVry relating to its false and unsubstantiated advertising claims, which included the 90% representation.

**The Department of Education ("DoE") Action**

101.    On January 27, 2016, the same day that the FTC filed a complaint against the DeVry Defendants, the Department of Education issued to DVU a Notice of Intent Limit, informing DVU of the DoE's intention to impose certain limitations on DVU's participation in programs authorized pursuant to Title IV due to DVU's representations in advertising materials representing the collective post-graduation employment outcomes of DeVry University students since 1975.[4]

102.    According to the DoE, starting in at least 2008 and continuing throughout at least August 2015, DVU represented in advertisement and marketing materials that: "Since 1975, 90.1% of DeVry graduates system-wide in the system-wide in the active job market held positions in their fields of study within 6 months of graduation."

103.    As noted by the DoE in its Notice of Intent, federal law mandates that educational institutions participating in programs authorized pursuant to Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, must be able to provide "the most recent available data concerning employment statistics and . . . any other information necessary to substantiate the truth of the advertisements." *See* 20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10). After

---

[4]    On August 28, 2015, the DoE served DVU with a request for documents requesting information about representations made by DeVry regarding the employability of its graduates, including, *inter alia*, the following assertion made by DeVry in its marketing and promotional materials: "Since 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." (the "Since 1975 Representation" or "Representation").

reviewing discovery materials provided by DeVry regarding the "Since 1975 Representation" the DoE concluded that DeVry could not substantiate its "Since 1975 Representation."

104.    As noted in the DoE's Notice of Intent, DVU's marketing campaign regarding the "Since 1975 Representation":

> . . . reflected more than a year's worth of in-depth consumer, marketplace, and brand research by DeVry, and represented a conscious decision by DeVry to make certain representations to students and prospective students for marketing and recruitment purposes. Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be made until at least August 2015, DeVry was unable to substantiate the truthfulness of those representations, as is required by federal law.

105.    As a result of DVU's failure to substantiate the "Since 1975 Representation", the DoE imposed numerous conditions on DVU in order to continue receiving Title IV funds, including the condition that DVU could no longer:

> make any representations, in advertisements or otherwise, that include statistics consisting of or based upon the post-graduation employment outcomes of students who graduated during the time that DeVry has conceded it does not possess graduate-specific information … Nor may DeVry make any representations that include or are based upon post-graduation employment statistics regarding other time periods that cannot be substantiated with graduate- specific information.

106.    DVU timely contested the Notice of Limitation on February 12, 2016, resulting in the matter becoming the subject of a Federal Student Aid proceeding entitled *In the Matter of DeVry University*, Docket No. 16-07-O.

107.    On October 13, 2016, DVU and the DoE entered into a settlement agreement. The DoE settlement allows DeVry to participate in Title IV programs under a provisional certification, and requires DVU to take a number of measures, including:

> (a)    "immediately cease publishing or otherwise using the Since 1975 Representation";
>
> (b)    cease making "any representations to a student, prospective student, accrediting agency, state agency, the Secretary, or any member of the public that

are based, in whole or in part, on the post-graduation employment outcomes of any student who graduated from [DeVry University] between 1975 and October 1980";

    (c)    maintain graduate-specific data to substantiate "any representations to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment [rates]";

    (d)    "maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of [DeVry University] students"; and

    (e)    for six years, engage a qualified, independent third party to review the required records and information relating to DeVry University graduates, so that that independent third party may issue a report on an annual basis stating whether DeVry university has satisfied its responsibilities to maintain graduate-specific employment records and has maintained information sufficient to establish its methodology used to make representations about employment outcomes of DeVry University graduates.

    108.    The DoE settlement also requires DeVry to post the following statement for two years on its website:

DeVry University previously advertised that "Since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." The U.S. Department of Education has asserted that the records maintained by DeVry University for the period 1975-1983 were not sufficient to substantiate the Since 1975 Representation, and thus that DeVry University could not substantiate this representation to the extent required by law. Accordingly, the University agreed to cease making the Since 1975 Representation and post this notification on its website.

**The New York Attorney General's Investigation**

    109.    On January 31, 2017 the New York Attorney General announced a settlement resolving its investigation into the DeVry Defendants' exaggerated employment outcome statics. The New York AG's press release explained that the settlement resolved an investigation which "revealed that DeVry lured students with ads that exaggerated graduates' success in finding employment at graduation and contained inadequately substantiated claims about graduates'

salary success.

110.     The New York Attorney General's investigation revealed that DeVry's

90% Claim was misleading because a substantial number of the graduates
included in the 90% figure were graduates who were already employed prior to
graduating from DeVry.  In fact, many of the graduates included in the 90% were
employed before they even enrolled at DeVry.  In addition, DeVry's employment
outcome statistics inaccurately classified a significant number of graduates as
employed in their field of study, when in reality the graduates were not working
in their field.  For example, DeVry counted graduates of DeVry's Technical
Management program as "employed in field" where the graduates were employed
as retail salespersons, receptionists, bank tellers, and data entry workers.  In some
cases, graduates were counted as employed in their field of study despite holding
positions that did not require a college degree.

**The Massachusetts Attorney General's Investigation**

111.     On July 5, 2017, the Massachusetts Attorney General reached a settlement

resolving allegations that DVU "used deceptive job placement rates in marketing certain online

programs to Massachusetts students."  The Massachusetts AG stated that "For years, for-profit

schools have tricked students into unaffordable loans with false promises of high earnings and

job opportunities.  Now, online programs like DeVry are following the same playbook."

**Information Provided by Confidential Witnesses in the Securities Class Action**

112.     In the Securities Class Action entitled *Pension Trust Fund for Operating*

*Engineers v. DeVry Education Group, Inc., et al.*, Case No. 1:16-CV-05198 (N.D. Ill.) (the

"Securities Class Action"), plaintiff investors make allegations against the DeVry Education

Group and various DeVry executives based on no fewer than twenty confidential informants.

The Securities Class Action allegations detail the positions and responsibilities of each of the

twenty confidential witnesses.  Counsel in that matter have alleged these witness accounts as

officers of the Court, and plaintiffs plead upon information and belief the accounts contained

therein.  The accounts of the Securities Class Action confidential witnesses further demonstrate

that the "90%" representation was false, that DeVry centrally approved the "90%" representation and mandated its use, and also centrally mandated the criteria for excluding graduates from the calculations, so that the false 90% figure was achieved.

113.   Securities Class Action Confidential Witness 8 ("CW8") said he discovered that the "90%" representation was not substantiated by data, that in approximately April 2014, he reported this to DeVry's compliance department, and was told by an in-house attorney that there was no data to substantiate the 90% representation, and that as a result he was terminated approximately one month later. CW8 had also internally questioned DeVry's SEC reporting. Securities Class Action CW 9 ("CW9") confirmed that CW8 left the company suddenly and unexpectedly.

114.   Securities Class Action CW 19 ("CW19") described himself as a "senior leader of the Company."  According to CW19, DeVry student graduate employment metrics were a topic of discussion in Quarterly Leadership Meetings, attended by the CEO and CFO and other senior executives.

115.   Securities Class Action CW 20 ("CW20"), the former Vice President of Academic Affairs and Chief Academic Officer for DeVry's Chamberlain College, confirmed that the job placement rate was discussed with the CEO in meetings repeatedly between 2012 and 2014.

116.   Securities Class Action CW 16 ("CW16") alleges that he was an Executive Assistant for Madeleine Slutsky, DeVry's Vice President of Career and Student Services.  He said Slutsky instructed him to find every marketing document that quoted the "90%" representation.  He believed that the project was to identify every single document which had "90%" representation because DeVry could no longer use them.

34

117.    Securities Class Action CW 3 ("CW3") explained that the "directive" on how to designate a student as non-job seeking came from DeVry's corporate office. According to CW3, designations of graduates as non-job-seeking were approved not only by the campus President, but also DeVry's Vice President of Career Services, Shelly Dubois. This practice, according to CW3, was common across all campuses, and only the timing of the designation was discretionary. Securities Class Action CW 5 ("CW5") also alleged "waiving" a number of graduates from the placement statistics in accordance with policy. Securities Class Action CW 17 ("CW17") confirmed that the guidelines for excluding a graduate from the statistics were determined centrally.

118.    CW3 also reported that her campus had to meet a target placement rate of 95-100%; that that the 95-100% job placement rate came from DeVry's corporate office; and this target was discussed at regular meetings he attended with representatives of DeVry's corporate office, which included DeVry's Corporate Director of Career Services.

119.    Securities Class Action CW 18 ("CW18") recalled that for the duration of his tenure at DeVry University his team used a mandatory recruitment script developed by upper management, and that the script touted the "90%" representation. According to CW18, the script was approved by DeVry University's President and others, whom he was able to identify by name. Securities Class Action CW1 ("CW1") also reported using a script, which contained the "90%" representation.

120.    Securities Class Action CW 2 ("CW2") alleged that job placement statistics given to prospective students were reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by marketing employees. Securities Class Action CW 4 ("CW4") corroborated that assertion, stating that

35

encouragement to use the job placement statistics "came down from the top," noting that "[o]ur managers told us, but their managers told them." CW2 came to doubt the accuracy of the advertised job placement statistics and believed that certain graduates were employed in jobs that most people would not define as being in their field of study. Securities Class Action CW 11 ("CW11"), who advanced significantly within the administration, reported that employees could be fired for not making the "90%" representation.

121.    Securities Class Action CW 7 ("CW7") alleged that DeVry had a written national policy that set forth the rules for which students would be included or excluded in the job placement statistics. CW7 explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system. CW3 corroborated the assertion that all job placement information was kept in HireDeVry, which provided DeVry with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in its official statistics. According to Securities Class Action CW 6 ("CW6"), campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company.

122.    According to Securities Class Action CW 10 ("CW10"), in response to regulatory scrutiny in 2010, DeVry began working to discover which students were actually finding work in their chosen fields. CW10 recalled being assigned to a project where he was to document recent DeVry graduates' employment status. CW10 was given a list of questions to ask students to verify whether they were employed in their field of study. He recalled that most of the students he tried to contact couldn't be reached, and those who were reached were often out of work or employed in a field that had nothing to do with their degree.

**The End of the 90% Representation**

123.     As shown above, the "90%" representation was a key component of DeVry's marketing and branding strategy for well over a decade.

124.     On information and belief, starting on or about December 19, 2016, the date of the FTC Stipulated Order for Permanent Injunction, DeVry was required to cease making its false "90%" representation advertising campaign.

125.     Likewise, pursuant to DVU's settlement with the DoE, as of October 13, 2016, DeVry was required to cease all advertisements making the "Since 1975 Representation."

126.     On information and belief, beginning in January of 2017, DeVry's new marketing strategy was to focus on the technology aspect of DeVry's programs to differentiate DeVry from its competitors.   As part of implementing this new strategy, DeVry is moving forward with what it refers to as its Tech Path associate or bachelor's degree programs of study while phasing out any remaining non-Tech Path programs that do not differentiate DeVry.

127.     Beginning on April 21, 2017, DeVry lowered its tuition for all new students applying to  any of DeVry's undergraduate Tech Path associate or bachelor's degree programs from $609 per credit hour to $487 per credit hours – a 20% reduction.  While DeVry didn't lower the tuition for its non-tech track programs, as noted above, DeVry is phasing-out its non-Tech Track programs.

128.     In May of 2017, Defendant DeVry Education Group changed its name to Adtalem Global Education.  Although the company stated in a news report that the name change was prompted by its broadened "education offerings and geographic reach," the news report implied that change was linked to DeVry's misrepresentation of its graduates' employment outcomes based on the proximity of the name change to DeVry's settlement of the FTC's case

alleging DeVry "misled tens of thousands of students about their post-graduation job and income prospects."[5]

129.    In its 2017 Form 10-K, Defendants admitted that DeVry was more expensive than competitors, that it had lowered its tuition recently, and that it was under pricing pressure and did not anticipate being able to raise prices in the near future.  It also admitted that it is currently experiencing competitive pressures and a decline in enrollment.  These admissions – that enrollment is down, tuition is down, competitors' less expensive offerings are gaining traction and tuition is not expected to rise -- came on the heels of the multiple government actions that forced Defendants to disclaim and cease making the false "90%" representation.

130.    All Plaintiffs have alleged that if DeVry had disclosed the truth about the "90%" representation, that Plaintiffs would either not have enrolled at DeVry or would have paid less for their educational services.  On information and belief, part, if not all, of DeVry's 20% tuition decrease is a direct and proximate result of DeVry not being able to falsely advertise that 90% of its graduates find careers in their field of study with in 6 months of graduation.

## CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of all persons in the United States who, within the relevant statute of limitations period, purchased educational services as part of any undergraduate degree program (the "Nationwide Class").

132.    Plaintiffs Steven Diaz, Steven Nickens, and Robyn Petersen seek to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in California or attending a California campus (the

---

[5]    *See, e.g.*,  http://www.chicagotribune.com/business/ct-devry-name-change-adtalem-20170524-story.html; Last accessed on April 12, 2018.

"California Class")

133.    Plaintiff Melissa Lotzman seeks to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Colorado or attending a Colorado campus (the "Colorado Class").

134.    Plaintiffs Elihu Guiste and Elijah Morgan seek to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Florida or attending a Florida campus (the "Florida Class").

135.    Plaintiffs Annette Pearson, David Viglielmo, and Dakar Villa seek to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Illinois or attending an Illinois campus (the "Illinois Class").

136.    Plaintiff Steven Nickens seeks to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Maryland (the "Maryland Class").

137.    Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly seek to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Missouri or attending a Missouri campus (the "Missouri Class").

138.    Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson seek to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in North Carolina or attending a North Carolina campus (the "North Carolina Class").

139.    Plaintiff Jairo Jara seeks to represent a Class defined as all persons who purchased

educational services as part of an undergraduate degree program from DeVry while residing in New Jersey or attending a New Jersey campus (the "New Jersey Class").

140.     Plaintiffs Julio Vargas seeks to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in New York or attending a New York campus (the "New York Class").

141.     Plaintiff Jennifer Wallace seeks to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Ohio or attending an Ohio campus (the "Ohio Class").

142.     Plaintiff Heather Anderson seeks to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Utah (the "Utah Class").

143.     Plaintiff Suzane Apodaca seeks to represent a Class defined as all persons who purchased educational services as part of an undergraduate degree program from DeVry while residing in Washington or attending a Washington campus (the "Washington Class").

144.     The Nationwide Class, the California Class, the Colorado Class, the Florida Class, the Illinois Class the Maryland Class, the Missouri Class, the New Jersey Class, the New York Class, the North Carolina Class, the Ohio Class, the Utah Class, and the Washington Class are sometimes referred to as "the Class."

145.     The California Class, the Colorado Class, the Florida Class, the Illinois Class, the Maryland Class, the Missouri Class, the New Jersey Class, the New York Class, the North Carolina Class, the Ohio Class, the Utah Class, and the Washington Class are referred to collectively as the "State Classes."

146.     Excluded from the Class are Defendants, the officers and directors of the

Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

147.    The Class is so numerous that joinder of all members is impractical.  Although Plaintiffs do not yet know the exact size of the Class or State Classes, the DeVry graduates graduated from DeVry programs throughout the United States, live throughout the United States, and on information and belief, members of the Class number in the hundreds of thousands.

148.    The Class is ascertainable because their members can be identified by objective criteria and through Defendants' own records.  Individual notice can be provided to Class members "who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

149.    There are numerous questions of law and fact common to the Class which predominate over any individual actions or issues, including but not limited to whether the labeling and marketing of the benefits of a DeVry degree were false and misleading.

150.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.  Plaintiffs have no interests antagonistic to the interests of the other members of the Class.  Plaintiffs and all members of the Class have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

151.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained counsel that is competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

152.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

## CONCEALMENT OF UNLAWFUL CONDUCT AND EQUITABLE TOLLING

153.   Plaintiffs disclaim any burden to plead facts regarding the statute of limitations. By its very nature, as alleged herein, Defendants' unlawful activity was self-concealing. By Defendants' affirmative acts, misrepresentations, and nondisclosures, any applicable statute of limitations on claims asserted by Plaintiffs and members of the Class have been and are tolled.

154.   Further, Defendants routinely updated their false and misleading representations, sometimes adjusting them one way or another slightly so as to make it appear that their representation was, in fact, valid.  These actions continued the conduct complained of until sometime following the filing of the lawsuit by the FTC discussed *supra*.

155.   Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least January 2016.  In the exercise of reasonable diligence, Plaintiffs could not have

discovered Defendants' violations of law such that suit could be brought before January 2016.

### FIRST CLAIM FOR RELIEF
### (Illinois Consumer Fraud and Deceptive Business Practices Act,
### 815 ILCS 505/1 *et seq.*)
### (By All Plaintiffs on Behalf of the Nationwide Class)

156.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein. Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class.

157.    This cause of action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA"). The express purpose of the ICFA is to "protect consumers" "against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . ." 815 ILCS 505/1.

158.    Plaintiffs and Nationwide Class members are "consumers" within the meaning of 815 ILCS 505/1(e) or otherwise sufficiently implicate consumer protection concerns under the ICFA

159.    Defendant was engaged in "trade or commerce" as defined by 815 ILCS 505/1(f).

160.    815 ILCS 505/2 declares unlawful "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omissions of such material fact. . . in the conduct of any trade or commerce."

161.    815 ILCS 505/2 also states that "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act." Defendants' unfair and deceptive practices are likely to mislead – and have mislead – the consumer acting reasonably in the circumstances and violate 815 ILCS 505/2

43

and 21 U.S.C. §352.

162.    Additionally, the Illinois Private Business and Vocational Schools Act of 2012 makes it a violation of the ICFA to violate ILCS 105 ILCS 426/85(k), namely "False or misleading statements, misrepresentations, or false promises that have the tendency or capacity to influence or induce persons to enroll in the program of study offered by the school." 815 ILCS 505/2MMM.

163.    Defendants have violated the ICFA by engaging in the unfair and deceptive practices as described herein which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

164.    Plaintiffs and the Nationwide Class have been aggrieved by Defendants' unfair and deceptive practices in that they purchased Defendants' educational services, which they would not have purchased or would not have paid as much for had they known the true facts.

165.    The damages suffered by Plaintiffs and the Nationwide Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants, as more fully described herein.

166.    Plaintiffs' actions were akin to consumer actions insofar as Plaintiffs saw Defendants' advertisements and accepted Defendants' "90%" representation as it personally concerned them.

167.    Defendants' "90%" representation involved consumer protection concerns because Defendants made the "90%" representation specifically for the purposes of inducing enrollment and/or appearing to be a more desirable educational institution. Further, Defendants' "90%" representation was specifically used for marketing purposes and to increase profits.

168.    Plaintiffs' relief would serve the public interest by protecting Class members and

future prospective students from Defendants' conduct, by enjoining Defendants from their deceptive marketing practices, and by discouraging other for-profit educational institutions from making false and misleading representations regarding the job placement rates for their graduates.

169.     Pursuant to 815 ILCS 505/10a, Plaintiffs and the Nationwide Class seek a court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

170.     Additionally, pursuant to 815 ILCS 505/10a, Plaintiffs and the Nationwide Class make claims for economic damages, punitive damages, and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
### (Illinois Private Business and Vocational Schools Act of 2012, 105 ILCS 426/5 *et seq.*)
### (By All Plaintiffs on Behalf of the Nationwide Class)

171.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein. Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class.

172.     This cause of action is brought pursuant to the Illinois Private Business and Vocational Schools Act of 2012, 105 ILCS 426/5 *et seq.* ("IPBVSA").  The express purpose of the IPBVSA is "to provide for the protection, education, and welfare of the citizens of this State; to provide for the education, protection, and welfare of the students of its private business and vocational schools; and to facilitate and promote quality education and responsible, ethical, business practices in each of the private business and vocational schools enrolling students in this State."  105 ILCS 426/5.

173.     Defendants are "private businesses and vocational schools" under the meaning of the IPBVSA.  105 ILCS 426/15.

174. Defendants have made "false or misleading statements, misrepresentations, or false promises that have the tendency or capacity to influence or induce persons to enroll in the program of study offered by the school" as described *supra*. 105 ILCS 426/85(k)(1).

175. Plaintiffs and members of the Nationwide Class have suffered damages as a result of Defendants' violations of 105 ILCS 426/85(k). As a result, Plaintiffs and the Nationwide Class seek actual damages, treble actual damages, reasonable attorney's fees, and costs. 105 ILCS 426/85(m).

**THIRD CLAIM FOR RELIEF**
**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*)**
**(By Plaintiffs Steven Diaz, Steven Nickens, and Robyn Petersen**
**on Behalf of the California Class)**

176. Plaintiffs Steven Diaz, Steven Nickens, and Robyn Petersen on behalf of themselves and the California Class, repeat and reassert each of the allegations contained above as if fully set forth herein.

177. The Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.* (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice and any false or misleading advertising.

178. In the course of conducting its business, Defendants committed unlawful business practices by, *inter alia*, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating Cal. Civil Code §§ 1750, *et seq.*, and the common law.

179. Plaintiffs Steven Diaz, Steven Nickens, and Robyn Petersen, individually and on behalf of other California Class members, reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

180. Defendants' actions constitute "unfair" business acts or practices because, as alleged above, *inter alia*, Defendants engaged in deceptive and false advertising, and misrepresented and omitted material facts regarding its educational services, and thereby offended an established public policy, and engaged in immoral, unethical, oppressive, and/or unscrupulous activities that are substantially injurious to consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §§ 17200, *et seq.*

181. The California Business & Professions Code §§ 17200, *et seq.*, also prohibits any "fraudulent business act or practice."

182. Defendants' actions, claims, nondisclosures, and misleading statements, as alleged in this Complaint, also constitute "fraudulent" business practices in violation of the UCL because, among other things, they are false, misleading, and/or likely to deceive reasonable consumers within the meaning of Business & Professions Code §§ 17200, *et seq.*

183. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

184. As a result of Defendants' pervasive false marketing, including deceptive and misleading acts and omissions as detailed in this Complaint, Plaintiffs and other members of the California Class have in fact been harmed as described above. If Defendants had not misrepresented their educational services as being more likely than they were to lead to a job in Plaintiffs' and Class Members' chosen fields, Plaintiffs and California Class Members would not have purchased Defendants' educational services or would not have paid as much for them as they did.

185. As a result of Defendants' unlawful, unfair, and fraudulent practices, Plaintiffs and the other California Class members have suffered injury in fact and lost money.

186.     As a result of their deception, Defendants have been able to reap unjust revenue and profit in violation of the UCL.

187.     As a result of Defendants' conduct in violation of the UCL, Plaintiffs and members of the California Class have been injured as alleged herein in amounts to be proven at trial because they purchased the educational services without full disclosure of the material facts discussed above.

188.     As a result, Plaintiffs Steven Diaz, Steven Nickens, and Robyn Petersen individually, and on behalf of the California Class, and the general public, seek restitution and disgorgement of all money obtained from Plaintiffs and the members of the California Class collected by Defendant as a result of unlawful, unfair, and/or fraudulent conduct, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

**FOURTH CLAIM FOR RELIEF**
**(California Consumer Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq.*)**
**(By Plaintiff Steven Nickens on Behalf of the California Class)**

189.     Plaintiff Steven Nickens on behalf of himself and the California Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

190.     This cause of action is brought pursuant to the California Consumer Legal Remedies Act (the "CLRA"). Plaintiff is a consumer as defined by Cal. Civ. Code § 1761(d). DeVry's educational services are "services" within the meaning of Cal. Civ. Code § 1761(b).

191.     Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff Steven Nickens and the California Class which were intended to result in, and did result in, the sale of the educational services in question:

(a)     Representing that . . . the services have . . . characteristics, . . . uses [or]

48

benefits . . . which they do not have;

        (b)     Representing that. . .the services are of a particular standard, quality, or grade . . . if they are of another; and

        (c)     Advertising services . . . with intent not to sell them as advertised.

192.    Defendants violated the CLRA by marketing and advertising the educational services in question in the manner described herein, when they knew, or should have known, that the labeling and advertisements were deceptive, false and misleading.

193.    Defendants were in a position to know, both from their own knowledge and from outside sources that the "90%" representation was false and misleading.

194.    Defendants intended that Plaintiff Steven Nickens and members of the California Class would rely on the false and misleading representations, and any reasonable consumer would deem the false and misleading representations material to the purchase of the services.

195.    Cal. Civ. Code §1780(a)(2) permits any court of competent jurisdiction to enjoin practices that violate California Civil Code § 1770.

196.    On October 28, 2016, Plaintiff Steven Nickens sent to Defendants a letter demanding that Defendant rectify the problems listed herein.  Defendants failed to rectify or agree to rectify the problems associated with the actions detailed above and/or failed to give notice to all affected consumers within thirty (30) days of the written notice pursuant to section 1782 of the CLRA, and so Plaintiff further seeks to recover actual or statutory compensatory/monetary damages as authorized by Cal. Civ. Code § 1780(a)(1), restitution as applicable and authorized under Cal. Civ. Code § 1780(a)(3), and punitive damages as authorized by Cal. Civ. Code § 1780(a)(4), which are appropriate in this case in light of Defendants' knowing, intentional, fraudulent and unconscionable conduct, Defendants' reckless

disregard of its legal obligations to Plaintiff Steven Nickens and the members of California Class, and/or as otherwise recoverable under Cal. Civ. Code § 1780(a)(4).

**FIFTH CLAIM FOR RELIEF**
**(Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*)**
**(By Plaintiff Melissa Lotzman On Behalf of the Colorado Class)**

197.     Plaintiff Melissa Lotzman on behalf of herself and the Colorado Class, repeat and reassert each of the allegations contained above as if fully set forth herein.

198.     Chapter 6-1-101 of the Colorado Consumer Protection Act ("CCPA") generally governs deceptive trade practices within the State of Colorado.  Colo. Rev. Stat. § 6-1-105.

199.     The CCPA governs trade practices affecting the sale of goods, services, or property.  Colo. Rev. Stat. § 6-1-105.

200.     The CCPA outlaws "mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of . . . services. . ."  Colo. Rev. Stat. § 6-1-105.

201.     The CCPA also outlaws "[f]ail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."  Colo. Rev. Stat. § 6-1-105.

202.     Plaintiff Melissa Lotzman is a consumer within the meaning of the CCPA.

203.     Defendants' false and misleading representations complained of herein are "trade practices" within the meaning of the CCPA.

204.     In the course of business, Defendants actively misrepresented the actual likelihood of being able to find a job and job placement rates in their graduates' chosen field within six months of graduation.  Through this misrepresentation, Defendants deprived Plaintiff

Melissa Lotzman and Colorado Class members of material facts regarding the value of the educational services provided by DeVry. Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of material facts with intent that others rely upon such concealment or misstatement in connection with the sale of its educational services.

205. Further, Defendants failed to disclose that their advertisements were based upon knowingly false figures which were shown in their advertisements with an intent to induce consumers to enroll at DeVry.

206. Defendants' actions as set forth above occurred in the conduct of trade or commerce. Defendants were and are engaged in the sale of educational services on a for-profit basis within the State of Colorado.

207. By failing to disclose the actual percentage of DeVry graduates employed in their chosen field within six months of graduation and by marketing DeVry degrees as highly likely to lead to obtaining a job within six months of graduation, Defendants have engaged in unfair or deceptive business practices in violation of the CCPA.

208. Defendants' unfair or deceptive acts or practices, including the "90%" representation, willfully concealed or actively intended to mislead consumers, tended to create a false impression in potential and actual consumers of Defendants' educational services, and in fact did deceive reasonable consumers, including Plaintiff Melissa Lotzman and members of the Colorado Class about the true value of educational services provided by DeVry.

209. Defendants knew or should have known that the "90%" representation was false and misleading.

210.    Defendants' misrepresentation regarding their actual job acquisition rates for students within six months of graduation made the educational services they marketed and sold less valuable than if the "90%" representation had been accurate.

211.    Plaintiff Melissa Lotzman and members of the Colorado Class suffered an ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the actual job placement rates for graduates of DeVry, Plaintiff Melissa Lotzman and members of the Colorado Class would not have enrolled at DeVry or would have paid less for DeVry's educational services.  Plaintiff Melissa Lotzman and members of the Colorado Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

212.    Defendants' unlawful acts and practices complained of herein affect the public interest.

213.    As a direct and proximate result of Defendants' violations of the CCPA, Plaintiff Melissa Lotzman and the Colorado Class have suffered injury-in-fact and/or actual damage.

214.    Defendants' conduct was knowing, willful, and/or intentional, and has caused injury-in-fact to Plaintiff Melissa Lotzman and members of the Colorado Class, and was therefore in "bad faith" under the terms of Colo. Rev. Stat. § 6-1-105.

215.    Defendants are liable to Plaintiff Melissa Lotzman and the Colorado Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, and any other just and proper relief under Colo. Rev. Stat. § 6-1-113.

## SIXTH CLAIM FOR RELIEF
### (Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.)
### (By Plaintiffs Elihu Guiste and Elijah Morgan On Behalf of the Florida Class)

216.    Plaintiffs Elihu Guiste and Elijah Morgan on behalf of themselves and the Florida

Class, repeat and reassert each of the allegations contained above as if fully set forth herein.

217.     Chapter 501 of the Florida Annotated Statutes generally governs consumer protection within the State of Florida (the "FDUTPA").  Fla. Stat. § 501.201, *et seq*.

218.     Under the FDUTPA, "trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."  Fla. Stat. § 501.203(8).

219.     Under the FDUTPA, "thing of value" includes, without limitation "any moneys, donation, membership, credential, certificate, prize, award, benefit, license, interest, professional opportunity, or chance of winning."  Fla. Stat. § 501.203(9).

220.     The FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

221.     Defendants' educational services are "services" or "things of value" within the meaning of the FDUTPA.

222.     Defendants' failure to disclose and active concealment of the benefits of their educational services was material to Plaintiffs Elihu Guiste and Elijah Morgan and the Florida Class.

223.     Defendants' unfair or deceptive acts or practices, including the "90%" representation, had a tendency or capacity to mislead, tended to create a false impression in potential and actual consumers of educational services, and were likely to and in fact did deceive reasonable consumers, including Plaintiffs Elihu Guiste and Elijah Morgan and members of the Florida Class about the true value of the educational services provided by  DeVry.

224.    Defendants knew or should have known that the "90%" representation was false and misleading.

225.    Defendants' misrepresentation regarding their actual job acquisition rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

226.    Plaintiffs Elihu Guiste and Elijah Morgan and Florida Class members' loss was caused by Defendants' willful misrepresentation regarding their job acquisition statistics.

227.    Plaintiffs Elihu Guiste and Elijah Morgan and members of the Florida Class suffered actual damages caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the actual job placement rates for DeVry graduates, Plaintiffs and members of the Florida Class would not have enrolled at DeVry or would have paid less for DeVry's educational services.

228.    As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs Elihu Guiste and Elijah Morgan and the Florida Class have suffered actual damages.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of the Georgia Fair Business Practices Act, O.G.C.A. 10-1-390, *et seq.*)**
**(By Plaintiffs DeLeon McKee and Ethel Holloway)**

229.    Plaintiffs DeLeon McKee and Ethel Holloway on behalf of themselves, repeat and reassert each of the allegations contained above as if fully set forth herein.

230.    This cause of action is brought pursuant to the Georgia Fair Business Practices Act ("GFBPA"), O.G.C.A. 10-1-390 *et seq.* Plaintiffs are consumers as defined by O.G.C.A. § 10-1-392(6).

231.    Defendants violated and continue to violate the GFBPA by engaging in the following practices proscribed by O.G.C.A. §10-1-393(b) in transactions with Plaintiffs DeLeon

McKee and Ethel Holloway which were intended to result in, and did result in, the sale of the educational services in question:

> (a)       Representing that. . .the services have . . . characteristics, . . . uses [or] benefits . . . which they do not have;

> (b)       Representing that. . .the services are of a particular standard, quality, or grade . . . if they are of another; and

> (c)       Advertising services . . . with intent not to sell them as advertised.

232.    Defendants violated the GFBPA by marketing and advertising the educational services in question in the manner described herein, when they knew, or should have known, that the labeling and advertisements were deceptive, false and misleading.

233.    Defendants were in a position to know, both from their own knowledge and from outside sources that the "90%" representation was false and misleading.

234.    Defendants intended that Plaintiffs DeLeon McKee and Ethel Holloway would rely on the false and misleading representations, and any reasonable consumer would deem the false and misleading representations material to the purchase of the services.

235.    On October 14, 2016, Plaintiff DeLeon McKee sent Defendants a letter demanding that Defendant rectify the problems listed herein.  Defendants failed to rectify or agree to rectify the problems associated with the actions detailed within thirty (30) days of the written notice pursuant to section 10-1-399(b) of the OGCA, and so Plaintiff DeLeon McKee seeks to recover actual or statutory compensatory/monetary damages as authorized by O.G.C.A. section 10-1-399, including reasonable attorneys' fees and expenses of litigation.

236.    On October 18, 2016, Plaintiff Ethel Holloway sent Defendants a letter demanding that Defendant rectify the problems listed herein.  Defendants failed to rectify or

agree to rectify the problems associated with the actions detailed within thirty (30) days of the written notice pursuant to section 10-1-399(b) of the OGCA, and so Plaintiff Ethel Holloway seeks to recover actual or statutory compensatory/monetary damages as authorized by O.G.C.A. section 10-1-399, including reasonable attorneys' fees and expenses of litigation.

## EIGHTH CLAIM FOR RELIEF
### (Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*)
### (In the Alternative, By Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa
### on Behalf of the Illinois Class)

237.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa repeat the allegations contained in the paragraphs above as if fully set forth herein.  Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa bring this Count individually and on behalf of the members of the Illinois Class.

238.    This cause of action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA").  The express purpose of the ICFA is to "protect consumers" "against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 815 ILCS 505/1.

239.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e) or otherwise sufficiently implicate consumer protection concerns under the ICFA

240.    Defendants were engaged in "trade or commerce" as defined by 815 ILCS 505/1(f).

241.    815 ILCS 505/2 declares unlawful "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or

56

omissions of such material fact . . . in the conduct of any trade or commerce."

242.    815 ILCS 505/2 also states that "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act."  Defendants' unfair and deceptive practices are likely to mislead – and have mislead – the consumer acting reasonably in the circumstances and violate 815 ILCS 505/2 and 21 U.S.C. § 352.

243.    Additionally, the Illinois Private Business and Vocational Schools Act of 2012 makes it a violation of the ICFA to violate ILCS 105 ILCS 426/85(k), namely "False or misleading statements, misrepresentations, or false promises that have the tendency or capacity to influence or induce persons to enroll in the program of study offered by the school."  815 ILCS 505/2MMM.

244.    Defendants have violated the ICFA by engaging in the unfair and deceptive practices as described herein which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

245.    Defendants' misrepresentation regarding their actual job acquisition rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

246.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and the Illinois Class have been aggrieved by Defendants' unfair and deceptive practices in that they purchased Defendants' educational services, which they would not have purchased or would not have paid as much for had they known the true facts.

247.    The damages suffered by Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and the Illinois Class were directly and proximately caused by the deceptive, misleading

and unfair practices of Defendants, as more fully described herein.

248.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa actions were akin to consumer actions insofar as Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa saw Defendants' advertisements and accepted Defendants' "90%" representation as it influenced their decisions to attend DeVry.

249.    Defendants' "90%" representation involved consumer protection concerns because Defendants made the "90%" representation specifically for the purposes of inducing enrollment and/or appearing to be a more desirable educational institution. Further, Defendants' "90%" representation was specifically used for marketing purposes and to increase their enrollment and profits.

250.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa requested relief would serve the public interest by protecting Class members and future prospective students from Defendants' conduct by enjoining Defendants from their deceptive marketing practices and by discouraging other for-profit educational institutions from making false and misleading representations regarding the acquisition of jobs for their graduates.

251.    Pursuant to 815 ILCS 505/10a, Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and the Illinois Class seek a court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

252.    Additionally, pursuant to 815 ILCS 505/10a, Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and the Illinois Class make claims for economic damages, punitive damages, and attorneys' fees and costs.

253.    As required by 815 ILCS 505/10a(d), notice of this action will be mailed to the Illinois Attorney General upon filing.

## NINTH CLAIM FOR RELIEF
**(Illinois Private Business and Vocational Schools Act of 2012, 105 ILCS 426/5 *et seq.*)**
**(In the Alternative, By Plaintiffs Annette Pearson, David Viglielmo,**
**and Derek Villa on Behalf of the Illinois Class)**

254.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa repeat the allegations contained in the paragraphs above as if fully set forth herein. Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa bring this Count individually and on behalf of the members of the Illinois Class.

255.    This cause of action is brought pursuant to the Illinois Private Business and Vocational Schools Act of 2012, 105 ILCS 426/5 *et seq.* ("IPBVSA").  The express purpose of the IPBVSA is "to provide for the protection, education, and welfare of the citizens of this State; to provide for the education, protection, and welfare of the students of its private business and vocational schools; and to facilitate and promote quality education and responsible, ethical, business practices in each of the private business and vocational schools enrolling students in this State."  105 ILCS 426/5.

256.    Defendants are "private businesses and vocational schools" under the meaning of the IPBVSA.  105 ILCS 426/15.

257.    Defendants have made "false or misleading statements, misrepresentations, or false promises that have the tendency or capacity to influence or induce persons to enroll in the program of study offered by the school" as described *supra*.  105 ILCS 426/85(k)(1).

258.    Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and members of the Illinois Class have suffered damages as a result of Defendants' violations of 105 ILCS 426/85(k).  As a result, Plaintiffs Annette Pearson, David Viglielmo, and Derek Villa and the Illinois Class seek actual damages, treble actual damages, reasonable attorney's fees, and costs. 105 ILCS 426/85(m).

## TENTH CLAIM FOR RELIEF
### (Violation of the Maryland Consumer Protection Act,
### Md. Commercial Law Code Ann. § 13-101, *et seq.*)
### (By Plaintiff Steven Nickens On Behalf of the Maryland Class)

259.     Plaintiff Steven Nickens on behalf of himself and the Maryland Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

260.     Chapter 13-101 *et seq.* of the Maryland Consumer Protection Act ("MCPA") generally governs deceptive trade practices within the State of Maryland.

261.     The CCPA governs trade practices affecting the sale of consumer goods and consumer services.  Md. Commercial Law Code Ann. § 13-101.

262.     The CCPA outlaws "[f]alse, falsely disparaging, or misleading oral or written statement[s], visual description, or other representation[s] of any kind which ha[ve] the capacity, tendency, or effect of deceiving or misleading consumers."  Md. Commercial Law Code Ann. § 13-301.

263.     The CCPA also outlaws "any unfair or deceptive trade practice" in "[t]he offer for sale of course credit or other educational services."  Md. Commercial Law Code Ann. § 13-303.

264.     Plaintiff Steven Nickens is a consumer within the meaning of the MCPA.

265.     Defendants' educational services are "consumer services" and "educational services" within the meaning of the CCPA.

266.     In the course of business, Defendants actively misrepresented the actual likelihood of being able to find a job in their graduates' chosen field within six months of graduation.  Through this misrepresentation, Defendants misled Plaintiff Steven Nickens and Maryland Class members of material facts regarding the value of the educational services provided by DeVry.  Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or

60

concealment, suppression or omission of any material fact with intent that others rely upon such concealment or misstatement in connection with the sale of its educational services.

267.    Further, Defendants failed to disclose that their advertisements were based upon knowingly false figures which were shown in their advertisements with an intent to induce consumers to enroll at DeVry.

268.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.  Defendants were and are engaged in the sale of educational services on a for-profit basis within the State of Maryland.

269.    By failing to disclose the actual percentage of DeVry graduates employed in their chosen field within six months of graduation and by marketing DeVry degrees as highly likely to lead to obtaining a job in their chosen field within six months of graduation, Defendants have engaged in unfair or deceptive business practices in violation of the MCPA.

270.    Defendants' unfair or deceptive acts or practices, including the "90%" representation, willfully concealed or actively intended to mislead consumers, tended to create a false impression in potential and actual consumers of educational services, and in fact did deceive reasonable consumers, including Plaintiff Steven Nickens and members of the Maryland Class about the true value of the educational services marketed and sold by  DeVry.

271.    Defendants knew or should have known that the "90%" representation was false and misleading.

272.    Defendants' misrepresentation regarding their actual job acquisition rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

273.    Plaintiff Steven Nickens and members of the Maryland Class suffered an

identifiable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the actual job outcome statistics for DeVry graduates Plaintiff and members of the Maryland Class would not have enrolled at DeVry or would have paid less for Defendants' services.

274. Defendants' unlawful acts and practices complained of herein affect the public interest.

275. As a direct and proximate result of Defendants' violations of the MCPA, Plaintiff Steven Nickens and the Maryland Class have suffered injury-in-fact and/or actual damage.

276. Defendants are liable to Plaintiff Steven Nickens and the Maryland Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and any other just and proper relief under Md. Commercial Law Code Ann. § 13-408.

**ELEVENTH CLAIM FOR RELIEF**
**(Violation of the Missouri Merchandising Practices Act,**
**Mo. Ann. Stat. § 407.010, *et seq*.)**
**(By Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly**
**On Behalf of the Missouri Class)**

277. Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly on behalf of themselves and the Missouri Class, repeat and reassert each of the allegations contained above as if fully set forth herein.

278. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices and the sale of advertisement of merchandise within the State of Missouri. Mo. Ann. Stat. § 407.020.

279. Under the MMPA, "merchandise" means "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Ann. Stat. § 407.010(4).

280. The MMPA outlaws "act[s], use[s] or employment by any person of any

deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Ann. Stat. § 407.020.

281. In the course of business, Defendants actively misrepresented the actual likelihood of being able to find a job in their graduates' chosen field within six months of graduation. Through this misrepresentation, Defendants deprived Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and Missouri Class members of material facts regarding the value of the educational services sold by DeVry. Further, Defendants have engaged in trade practices with a tendency or capacity to deceive. Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment or misstatement in connection with the sale of its educational services.

282. Defendants' misrepresentation regarding their actual job acquisition rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

283. Defendants' unfair or deceptive acts or practices, including the "90%" representation, had a tendency or capacity to mislead, tended to create a false impression in potential and actual consumers of educational services, and were likely to and in fact did deceive reasonable consumers, including the Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and members of the Missouri Class about the true value of the educational services sold by DeVry.

284. Defendants knew or should have known that the "90%" representation was false

and misleading.

285.    Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and members of the Missouri Class suffered an ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the actual job acquisition numbers for degrees conferred by DeVry, Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and members of the Missouri Class would not have enrolled at DeVry or would have paid less for DeVry's educational services.  Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and members of the Missouri Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

286.    Defendants' unlawful acts and practices complained of herein affect the public interest.

287.    As a direct and proximate result of Defendants' violations of the MMPA, Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and the Missouri Class have suffered injury-in-fact and/or actual damage.

288.    Defendants are liable to Plaintiffs Christopher Condie, Lynda Crilley, and Renee Heather Polly and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under Mo. Ann. Stat. § 407.025.

### TWELFTH CLAIM FOR RELIEF
**(Violation of the North Carolina Consumer Protection Act, N.C. Gen. Stat. § 75-1, *et seq.*)**
**(By Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson**
**On Behalf of the North Carolina Class)**

289.    Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson on behalf of themselves and the North Carolina Class, repeat and reassert each of the allegations contained above as if fully set forth herein.

290.    Chapter 75, Article 1 of the North Carolina General Statutes generally governs consumer protection within the State of North Carolina (the "NCCPA").  N.C. Gen. Stat. § 75-1, *et seq.*

291.    Under the NCCPA, "commerce" "includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession."  N.C. Gen. Stat. § 75-1.1(b).

292.    The NCCPA outlaws "unfair or deceptive acts or practices in or affecting commerce."  N.C. Gen. Stat. § 75-1.1(b).

293.    In the course of business, Defendants willfully misrepresented the actual likelihood of being able to find a job in their graduates' chosen field within six months of graduation.  Through this misrepresentation, Defendants deceived Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson and the North Carolina Class members with respect to material facts regarding the true value of the educational services sold by DeVry.  Further, Defendants have engaged in trade practices with a tendency or capacity to deceive.  Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of any material fact with intent that others rely to their detriment upon such concealment or misstatement in connection with the sale of its educational services.

294.    Defendants' misrepresentation regarding their actual job acquisition rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

295.    Defendants' unfair or deceptive acts or practices, including the "90%" representation, had a tendency or capacity to mislead, tended to create a false impression in

potential and actual consumers of educational services, and were likely to and in fact did deceive reasonable consumers, including Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson and members of the North Carolina Class about the true value of the educational services sold by DeVry.

296.    Defendants knew or should have known that the "90%" representation was false and misleading.

297.    Defendants' conduct was willful.

298.    Defendants maintain two campuses within the State of North Carolina: a Charlotte campus and a Morrisville (Raleigh Durham) campus.    Defendants' conduct substantially affected trade or commerce within the State of North Carolina.

299.    Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson and members of the North Carolina Class suffered an actual, ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the actual job placement rates for DeVry graduates, Plaintiffs and members of the North Carolina Class would not have enrolled at DeVry or would have paid less for DeVry's educational services.  Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson and members of the North Carolina Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

300.    Defendants' unlawful acts and practices complained of herein affect the public interest.

301.    As a direct and proximate result of Defendants' violations of the NCCPA, Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson and the North Carolina Class have suffered injury-in-fact and/or actual damage.

302.    Defendants are liable to Plaintiffs Darius Bryant, Annette Pearson, and Thomas Pearson and the North Carolina Class for damages in amounts to be proven at trial, including treble damages, and, circumstances permitting, attorneys' fees, and any other just and proper relief under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

## THIRTEENTH CLAIM FOR RELIEF
### (Violation of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1, *et seq*.)
### (By Plaintiff Jairo Jara On Behalf of the New Jersey Class)

303.    Plaintiff Jairo Jara on behalf of himself and the New Jersey Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

304.    Chapter 8, Section 56 of the New Jersey Statutes comprises the New Jersey Consumer Fraud Act (the "NJCFA"), which generally governs unlawful business practices and the sale or advertisement of merchandise within the State of New Jersey.  N.J. Stat. § 56:8.

305.    Under the NJCFA, "merchandise" means "any objects, wares, goods, commodities, services, or anything offered, directly or indirectly, to the public for sale."  N.J. Stat. § 56:8-1(c).

306.    The NJCFA outlaws the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."  N.J. Stat. § 56:8-2.

307.    In the course of business, Defendants actively misrepresented the actual likelihood of being able to find a job in their graduates' chosen field within six months of

67

graduation. Through this misrepresentation, Defendants deprived Plaintiff Jairo Jara and New Jersey Class members of material facts regarding the true value of the educational services sold by DeVry. Further, Defendants have engaged in trade practices with a tendency or capacity to deceive. Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment or misstatement in connection with the sale of its educational services.

308. Defendants' misrepresentation regarding their actual job placement rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

309. Defendants knew or should have known that the "90%" representation was false and misleading.

310. Defendants' failure to disclose and active concealment of the benefits of their educational services was material to Plaintiff Jairo Jara and the New Jersey Class.

311. Plaintiff Jairo Jara and members of the New Jersey Class suffered an ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the actual job acquisition numbers for DeVry graduates, Plaintiff Jairo Jara and members of the New Jersey Class would not have enrolled at DeVry or would have paid less for DeVry's services.

312. As a direct and proximate result of Defendants' violations of the NJCFA, Plaintiff Jairo Jara and the New Jersey Class have suffered an ascertainable loss.

313. Defendants are liable to Plaintiff Jairo Jara and the New Jersey Class for damages in amounts to be proven at trial, including attorneys' fees and costs, and any other just and

proper relief under N.J. Stat. § 56:8-2.11-2.12 and N.J. Stat. § 4:32-2(h).

## SIXTEENTH CLAIM FOR RELIEF
### (Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 349)
### (By Plaintiff Julio Vargas on Behalf of the New York Class)

314.    Plaintiff Julio Vargas on behalf of himself and the New York Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

315.    Plaintiff Julio Vargas brings this claim on behalf of the New York Class.

316.    Plaintiff Julio Vargas and the New York Class are "persons," as defined by the New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

317.    Defendants are a "person[s]," "firm[s]," "corporation[s]," or "association[s]," as defined by the New York GBL, N.Y. Gen. Bus. Law § 349.

318.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct directed toward consumers, as described herein, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

319.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

320.    In the course of its business, Defendant intentionally misrepresented the job placements rates of DeVry graduates within six months of graduation, and otherwise engaged in activities with a tendency or capacity to deceive.

321.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of educational services.

322.    By failing to disclose and actively concealing the actual job placement rates of its graduates within six months of graduation, Defendants engaged in unfair or deceptive business practices in violation of the New York GBL.  Defendants deliberately misrepresented the information about their job placement rates within six months of graduation in order to induce students to purchase educational services by enrolling at DeVry.

323.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the actual job acquisition figures of DeVry graduates within six months of graduation.  Defendants compounded the deception by repeatedly the "90%" representation long after they knew or should have known that their representations were false.

324.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff Julio Vargas, about the true nature and value of their educational services.

325.    Defendants intentionally and knowingly misrepresented material facts regarding their educational services with intent to mislead Plaintiff Julio Vargas and the New York Class.

326.    Defendants knew or should have known that their conduct violated the New York GBL.

327.    Defendants owed Plaintiff Julio Vargas and the New York Class a duty to disclose the true job placement rates within six months of graduation because Defendants:

(a)    Possessed exclusive knowledge of actual job placement rates;

(b)    Intentionally concealed the actual job placement rates from Plaintiff Julio Vargas and the Class; and

(c)      Made incomplete representations about their job acquisition rates, while purposefully withholding material facts from Plaintiff Julio Vargas and the Class that contradicted these representations.

328.    Because Defendants fraudulently concealed the fact that the "90%" representation was false, the price charged for Defendants' educational services was greatly inflated.  In light of Defendants' conduct, DeVry educational services are worth significantly less than DeVry charged Plaintiff Julio Vargas.

329.    Defendants' failure to disclose and active concealment of the benefits of their educational services was material to Plaintiff Julio Vargas and the New York Class.  Defendants' misrepresentation regarding their actual job placement rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

330.    Plaintiff Julio Vargas and the New York Class suffered ascertainable losses caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of that the "90%" representation was false and misleading, Plaintiff Julio Vargas would not have enrolled at DeVry or would have paid less for Defendants' services.

331.    Defendants' unlawful acts and practices complained of herein affect the public interest.

332.    As a direct and proximate result of Defendants' violations of the New York GBL, Plaintiff Julio Vargas and the New York Class have suffered injury-in-fact and/or actual damage.

333.    Because Defendants' willful and knowing conduct caused injury to the New York Class, the New York Class seeks recovery of actual damages, reasonable attorneys' fees and costs, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**SEVENTEENTH CLAIM FOR RELIEF**
**(Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 350)**
**(By Plaintiff Julio Vargas on Behalf of the New York Class)**

334.     Plaintiff Julio Vargas on behalf of himself and the New York Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

335.     Plaintiff Julio Vargas brings this claim on behalf of the New York Class.

336.     Defendants were and are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

337.     N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

338.     Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or by which the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and the New York Class.

339.     Defendants have violated New York GBL § 350 because Defendants' "90%" misrepresentation was material and likely to deceive a reasonable consumer.

340.     Members of the New York Class have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising.  In purchasing Defendants' educational services, Plaintiff Julio Vargas and the New York Class relied on the misrepresentations and/or omissions of Defendants with respect to their ability to find a job in their chosen field within six months of graduation.  Defendants' representations were false and/or misleading because they materially misrepresented Defendants' own internal statistics regarding job acquisition and/or placement within six months of graduation.  Had Plaintiff Julio Vargas and the New York Class known this, they would not have purchased Defendants'

educational services.

341.     Pursuant to N.Y. Gen. Bus. Law § 350-e, the New York Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for every New York Class member/or deceptive practice, attorneys' fees, and any other just and proper relief available under N.Y. Gen. Bus. Law § 350.

**FOURTEENTH CLAIM FOR RELIEF**
**(Violation of the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01, *et seq*.)**
**(By Plaintiff Jennifer Wallace on Behalf of the Ohio Class)**

342.     Plaintiff Jennifer Wallace, on behalf of herself and the Ohio Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

343.     Chapter 1345 of the Ohio Revised Code generally governs unlawful sales practices within the State of Ohio (the "OCSPA").  O.R.C. § 1345.01, *et seq.*

344.     Under the OSCPA, a "consumer transaction" means "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things . . . ."  O.R.C. § 1345.01(A).

345.     The OSCPA outlaws "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."  O.R.C. § 1345.02(A).

346.     Further, acts or practices that can be unfair or deceptive include consumer transactions which have "sponsorship[s], approval, performance characteristics, accessories, uses, or benefits that [they] do[] not have," or that they are of a "particular standard, quality, grade, style, prescription, or model, if [they are] not."  O.R.C. § 1345.02(B).

347.     In the course of business, Defendants actively misrepresented the actual

73

likelihood of being able to find a job in their graduates' chosen field within six months of graduation. Through this misrepresentation, Defendants deceived Plaintiff Jennifer Wallace and the Ohio Class members with respect to material facts regarding the value of the educational services sold by DeVry. Further, Defendants have engaged in trade practices with a tendency or capacity to deceive. Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment or misstatement in connection with the sale of its educational services.

348. Further, Defendants, in the course of advertising and selling educational services, Defendants took advantage of Plaintiff Jennifer Wallace and the Ohio Class members' lack of knowledge and/or understanding of Defendants' actual employment figures.

349. By failing to disclose the actual percentage of DeVry graduates employed in their chosen field within six months of graduation and by marketing DeVry degrees as highly likely to lead to obtaining a job within six months of graduation, Defendants have engaged in unfair or deceptive business practices in violation of the OCSPA.

350. Defendants' unfair or deceptive acts or practices, including the "90%" representation, had a tendency or capacity to mislead, tended to create a false impression in potential and actual consumers of educational services, and were likely to and in fact did deceive reasonable consumers, including Plaintiff Jennifer Wallace and the members of the Ohio Class about the true value of the educational services sold by DeVry.

351. Defendants knew that the "90%" representation was false and misleading.

352. Plaintiff Jennifer Wallace and the members of the Ohio Class suffered an ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material

information. Had they been aware of the actual job placement rates for DeVry graduates, Plaintiff and the members of the Ohio Class would not have enrolled at DeVry or would have paid less for Defendants' services.

353. As a direct and proximate result of Defendants' violations of the OCSPA, Plaintiff Jennifer Wallace and the Ohio Class have suffered injury-in-fact and/or actual damage.

354. Defendants' acts are sufficiently similar to other actions by which courts have maintained actions under the OCSPA, as required by O.R.C. § 1345.09(B), for maintenance of this claim for relief as a class action.

355. Defendants are liable to Plaintiff Jennifer Wallace and the Ohio Class for actual damages in amounts to be proven at trial and any other just and proper relief under O.R.C. § 1345.09.

## FIFTEENTH CLAIM FOR RELIEF
### (Violation of Utah Truth in Advertising Law, Utah Code Ann. § 13-11a-3)
### (By Plaintiff Heather Anderson on Behalf of the Utah Class)

356. Plaintiff Heather Anderson on behalf of herself and the Utah Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

357. This cause of action is brought pursuant to the Utah Truth in Advertising Law ("UTAL"). Plaintiff is a person as defined by Utah Code Ann. § 13-11a-2(7). The educational services are "goods and services" within the meaning of the UTAL.

358. Defendants violated and continue to violate the UTAL by engaging in the following practices proscribed by Utah Code Ann. § 13-11a-3 in transactions with Plaintiff and the Utah Class which were intended to result in, and did result in, the sale of the educational services in question:

    (e)    Represen[ting] that [...] the services have [...] characteristics, [...] uses [or] benefits [...] which they do not have;

\*    \*    \*

(g)    Represen[ting] that […] the services are of a particular standard, quality, or grade […] if they are of another; and

\*    \*    \*

(i)    Advertis[ing] […] services […] with intent not to sell them as advertised.

359.    Defendants violated the UTAL by marketing and advertising the educational services in question in the manner described herein, when they knew, or should have known, that the labeling and advertisements were deceptive, false and misleading.

360.    Defendants were in a position to know, both from their own knowledge and from outside sources, that the "90%" representation was false and misleading.

361.    Defendants intended that Plaintiff Heather Anderson and members of the Utah Class would rely on the false and misleading representations, and any reasonable consumer would deem the false and misleading representations material to the purchase of the services. Plaintiff Heather Anderson and members of the Utah Class would not have purchased DeVry's educational services or would have paid less for them had they known of Defendants' misrepresentations

362.    Defendants are liable to Plaintiff Heather Anderson and the Utah Class for actual damages in amounts to be proven at trial or $2,000, whichever is greater, as well as including attorneys' fees, costs, and any other just and proper relief under Utah Code Ann. §13-11a-4.

### SIXTEENTH CLAIM FOR RELIEF
**(Violation of the Washington Unfair Business Practices Act,**
**Rev. Code Wash. § 19.86.010, *et seq*.)**
**(By Plaintiffs Suzane Apodaca On Behalf of the Washington Class)**

363.    Plaintiff Suzane Apodaca on behalf of herself and the Washington Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

76

364.     Chapter 19.86 of the Washington Revised Code generally governs unlawful trade practices within the State of Washington (the "WUBPA").  Rev. Code Wash. § 19.86.010, *et seq.*

365.     Under the WUBPA, "trade" and "commerce" mean "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington."  Rev. Code Wash. § 19.86.010(2).

366.     The WUBPA outlaws "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Rev. Code Wash. § 19.86.020.

367.     In the course of business, Defendants actively misrepresented the actual likelihood of being able to find a job in their graduates' chosen field within six months of graduation.  Through this misrepresentation, Defendants deceived Plaintiff Suzane Apodaca and the Washington Class members with respect to material facts regarding the value of the educational services sold by DeVry.  Further, Defendants have engaged in trade practices with a tendency or capacity to deceive.  Moreover, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of material facts with intent that others rely upon such concealment or misstatement in connection with the sale of its educational services.

368.     Further, Defendants, in the course of advertising and selling educational services, took advantage of Plaintiff Suzane Apodaca and the Washington Class members' lack of knowledge and/or understanding of Defendants' actual employment figures.

369.     By failing to disclose the actual percentage of DeVry graduates employed in their chosen field within six months of graduation  Defendants have engaged in unfair or deceptive business practices in violation of the WUBPA.

370.     Defendants' unfair or deceptive acts or practices, including the "90%"

77

representation, had a tendency or capacity to mislead, tended to create a false impression in potential and actual consumers of educational services, and were likely to and in fact did deceive reasonable consumers, including Plaintiff Suzane Apodaca and members of the Washington Class about the true value of the educational services sold by DeVry.

371.    Defendants knew or should have known that the "90%" representation was false and misleading.

372.    Defendants' failure to disclose and active concealment of the benefits of their educational services was material to Plaintiff Suzane Apodaca and the Washington Class. Defendants' misrepresentation regarding their actual job placement rates for students within six months of graduation made the educational services marketed and sold by DeVry less valuable than if the "90%" representation had been accurate.

373.    Plaintiff and members of the Washington Class suffered an ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the actual job placement rates for graduates of DeVry, Plaintiff Suzane Apodaca and members of the Washington Class would not have enrolled at DeVry or would have paid less for Defendants' educational services.

374.    Defendants' unlawful acts and practices complained of herein affect the public interest as defined in Rev. Code Wash. § 19.86.093

375.    As a direct and proximate result of Defendants' violations of the WUBPA, Plaintiff Suzane Apodaca and the Washington Class have suffered injury-in-fact and/or actual damage.

376.    Defendants are liable to Plaintiff Suzane Apodaca and the Washington Class for damages in amounts to be proven at trial, including attorneys' fees, costs, treble damages, and

any other just and proper relief under § 19.86.090.

377.    Pursuant to § 19.86.095, notice of this complaint will be mailed upon filing to the Washington Attorney General.

**TWENTY-THIRD CLAIM FOR RELIEF**
**(Unjust Enrichment)**
**(By All Plaintiffs on Behalf of the Nationwide Class)**

378.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

379.    Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class.

380.    Plaintiffs and members of the Nationwide Class conferred benefits on Defendants by purchasing educational services.

381.    Defendants have been unjustly enriched in retaining revenues derived from Plaintiffs and Class members' purchases of the educational services.  Retention of that revenue under these circumstances is unjust and inequitable because Defendants misrepresented facts concerning the characteristics, qualities, and value of the educational services and caused Plaintiffs and Class members to purchase the educational services and to pay more for the educational services, which they would not have done had the true facts been known.

382.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action;

B.    For an order declaring that the Defendants' conduct violates the statutes

79

referenced herein;

C.    Awarding compensatory and punitive damages in favor of Plaintiffs, members of the Nationwide Class and the State Classes against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    For an order of restitution and/or disgorgement and all other forms of equitable monetary relief;

E.    Awarding Plaintiffs and members of the Class their reasonable costs and expenses incurred in this action, including attorney's fees; and

F.    Awarding such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated: April 12, 2018                         Respectfully submitted,

By: */s/ Theodore B. Bell*

Theodore B. Bell
Carl Malmstrom
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
One Dearborn Street, Suite 2122
Chicago, IL 60603
Tel: (312) 984-0000
Fax: (312) 214-3110
Email: tbell@whafh.com
Email: malmstrom@whafh.com

Thomas H. Burt
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 545-4653
Email: burt@whafh.com

80

Thomas J. McKenna
Gregory M. Egleston
**GAINEY MCKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: egleston@gme-law.com
Email: tjmckenna@gme-law.com

*Counsel for Plaintiffs and the Putative Class*